IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION – CINCINNATI

| | | |
|---|---|---|
| ALVIN MOORE, | : | Case No. 1:18-cv-486 |
| Plaintiff, | : | Judge Matthew W. McFarland |
| v. | : | |
| COCA COLA BOTTLING COMPANY CONSOLIDATED, | : | |
| Defendant. | : | |

### ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on Defendant's Motion for Summary Judgment (Doc. 72). Plaintiff filed a response in opposition (Doc. 79), to which Defendant replied in support (Doc. 81). Thus, this matter is fully briefed and ripe for review. For the reasons provided below, Defendant's Motion for Summary Judgment (Doc. 72) is **GRANTED.**

### FACTS

This case stems from Plaintiff Alvin Moore's employment with, and subsequent termination from, Defendant Coca Cola Bottling Company Consolidated. Moore alleges that Defendant violated federal and Ohio law by terminating him, claiming that such termination was done to racially discriminate and retaliate against Moore. (*See* Am. Compl., Doc. 37.) As a result, Moore brings these claims: (1) racial discrimination in violation of Title VII and Ohio Revised Code § 4112.02; (2) retaliation in violation of Title VII and Ohio Revised Code § 4112.99; and (3) intentional infliction of emotional distress.

Defendant is the largest independent Coca-Cola bottler in the United States with

1

its headquarters in Charlotte, North Carolina. (Am. Compl., Doc. 37, ¶ 4; Answer, Doc. 40, ¶ 3.) Defendant has a facility located on Duck Creek Road in Cincinnati, Ohio. (Am. Compl., Doc. 37, ¶ 3; Answer, Doc. 40, ¶ 3.) Moore, an African American male, was employed at the Duck Creek Facility in 2015 as a pallet jack operator. (Am. Compl., Doc. 37, ¶ 14-15; Answer, Doc. 40, ¶ 14-15.) He possesses an associate's degree in fashion merchandising and design and a bachelor's degree in health care administration. (Moore Dep., Doc. 70, Pg. ID 1589.) Moore was promoted to forklift operator in January of 2017, where he served on the third shift. (Am. Compl., Doc. 37, ¶ 15; Answer, Doc. 40, ¶ 15.) During this time, Moore worked in the warehouse and the distribution center. (Ford Dec., Doc. 72-3, ¶ 3.)

The International Brotherhood of Teamsters, Local 1199 ("Union") represented all non-management employees who worked in the warehouse as the sole collective bargaining unit agent at the Duck Creek Facility, including Moore. (CBA, Doc. 70-7, Pg. ID 1910; Moore Dep., Doc. 70, Pg. ID 1616.) Defendant's employees are required to adhere to the Work Rules negotiated with the Union, as well as the Collective Bargaining Agreement ("CBA"). (CBA, Doc. 70-7, Pg. ID 1910.) Article 7, § 1 of the CBA disallows any employee from "authorizing, instigating, or causing or participating in any strike, work stoppage, picket line, bannering, slowdown, boycott or any other actions which interrupts or interferes with [Defendant's] operations." (*Id.* at 1914.) If an employee were to violate Article 7, § 1, the employee would "be subject to disciplinary action by [Defendant] including immediate discharge." (*Id.*) Moore was provided with physical and electronic copies of the CBA, which he reviewed. (Moore Dep., Doc. 70, Pg. ID 1626-

27.)

Employees must also follow Defendant's safe work policies, which include a Drug and Alcohol Abuse Policy. (Drug and Alcohol Abuse Policy, Doc. 70-8, Pg. ID 1955.) The policy states that "employees who test positive for drugs, alcohol, or like substances during working hours or while on [Defendant's] property . . . shall be subject to immediate discharge." (*Id.*) Marijuana is prohibited by the policy. (*Id.*) The policy included threshold levels that would be treated as testing positive for a substance. (*Id.* at 1960.) To test positive for marijuana, the drug test must amount to more than 50 nanograms per milliliter. (*Id.*) The policy also provides that an employee may be made to test for drugs, alcohol, or like substances when: (1) an employee is involved in a work-related accident, (2) an employee inflicted or caused injury to another employee, or (3) management reasonably suspects that an employee has been using drugs, alcohol or like substances. (*Id.* at 1956.)

On March 28, 2017, Moore was part of a work accident. (Moore Dep., Doc. 70, Pg. ID 1677.) Moore was drug tested and the drug test was positive for marijuana. (2017 Drug Test, Doc. 70-12, Pg. ID 1975.) However, Moore's drug test did not meet the threshold level of 50 nanograms per milliliter of marijuana outlined in the Drug and Alcohol Policy. (Drug and Alcohol Policy, Doc. 70-8, Pg. ID 1960.) Despite his drug test not reaching the threshold level, Moore, the Union, and Defendant negotiated the Second Chance Agreement ("SCA"). (*See* SCA, Doc. 70-11.)

The SCA provided that Moore would remain employed but would have to cooperate "in any number of unannounced, unscheduled tests on [his] breath, blood, or

3

urine for evidence of alcohol or drug use at times determined solely by [Defendant] during the next twenty-four (24) months." (*Id.* at 1966.) Moore signed the SCA on April 11, 2017, thereby stating that he read and understood the SCA and that he entered into the SCA "voluntarily and with full knowledge of its significance after being given a reasonable opportunity to discuss its terms with a representative of the Union[.]" (*Id.* at 1966-67.) Moore further acknowledged that he could be terminated for further violations of the SCA or the Drug and Alcohol Abuse Policy (*Id.*) Moore was randomly drug tested six times between signing the SCA and his termination. (Drug Tests, Doc. 79-11, Pg. ID 2976.)

On June 21, 2017, Moore was allegedly insubordinate during a pre-shift meeting. (July 6, 2017 Termination Letter, Doc. 70-9, Pg. ID 1964.) At the meeting, management was explaining to employees that the employees could no longer stage product outside the warehouse, which Moore claims was done to speed up the work process. (Moore Dep., Doc. 70, Pg. ID 1644.) Multiple employees complained that this would slow down the work. (*Id.* at 1644-45.) Moore alleges that many were using curse words regarding this change. (*Id.*) Then, Moore, in an alleged attempt to defuse the situated, stated, "hey, f*** it, if they want you to slow down, slow the h*** down and let's get back to work." (*Id.* at 1645.)

Moore was later informed by a coworker that management believed he was attempting to incite a "slowdown" in violation of the CBA. (Moore Dep., Doc. 70, Pg. ID 1646.) He was then called into a meeting with multiple supervisors and was informed he was being terminated for "stopping the build." (*Id.*) Defendant terminated Moore on July

4

6, 2017, claiming that Moore violated "the Cincinnati Warehouse and Production Center Work Rules and Article 7 of the [CBA]." (*Id.*)

After negotiations between the parties and the Union, Defendant offered Moore a Last Chance Agreement ("LCA"). (*See* LCA, Doc. 70-10.) In fact, Frank Arrington, the Union Vice President, and Boland discussed and negotiated the LCA on Moore's behalf. (Boland Dep., Doc. 69, Pg. ID 1316-17.) Moore was told to take some time to consider the LCA, but he signed the LCA on July 14, 2017, the same day it was provided to him. (*Id.* at 1965; Moore Dep., Doc. 70, Pg. ID 1669-71.) Arrington was also available for Moore to consult regarding the LCA if he chose to. (Moore Dep., Doc. 1670-71.) The LCA provided that, if Moore violated any other policy relating to insubordination within a twelve-month period, Defendant would have the right to immediately terminate Moore. (*Id.*)

The LCA also contains a release which states that "[i]n consideration of [the LCA], Mr. Moore releases and forever discharges [Defendant] and the Union . . . from any and all liability of any kind whatsoever, relating to his employment with [Defendant], arising prior to the date of [the LCA.]" (LCA, Doc. 70-10, Pg. ID 1965.) Such language includes claims of racial discrimination or retaliation. By signing the LCA, Moore acknowledged that he read the LCA in full and understood its contents and consequences. (*Id.*)

Sometime after these incidents, Moore was transferred to the manufacturing center as a lab technician. (Ford Dec., Doc. 72-3, Pg. Dd 2229.) Coresa Ford was the Plant Manager for the manufacturing center at the time of Moore's transfer. (*Id.*) When Moore transitioned, Ford became aware that he had once failed a drug test and signed a SCA. (*Id.*) Moore was required to take a random drug test on July 12, 2018, which he tested

5

positive for marijuana. (2018 Drug Test, Doc. 70-13, Pg. ID 1976.) Moore admitted that he tested positive for marijuana on the July 2018 drug test. (Moore Dep., Doc. 70, Pg. ID 1698.) Then, on July 31, 2018, Moore was terminated for failing the drug test in violation of the SCA. (Corrective Action Form, Doc. 70-14, Pg. ID 1981.) He filed a grievance with the Union (Doc. 70-15), but the Union elected not to advance the grievance. (Request for Admissions, Doc. 72-6, Pg. ID 2254.) Not much later, he brought this action.

## LAW

Courts must grant summary judgment if the record "reveals that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing Fed. R. Civ. P. 56(c)). Once the movant has met its initial burden of showing that no genuine issue of material fact remains, the nonmoving party must present "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To do so, the nonmovant must present "significant probative evidence . . . on which a reasonable jury could return a verdict" in their favor. *Chappell v. City of Cleveland*, 585 F.3d 901, 913 (6th Cir. 2009).

The court "must view the facts and any inferences that can be drawn from those facts . . . in the light most favorable to the nonmoving party." *Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007). This requirement, however, does not mean that the Court must find a factual dispute where record evidence contradicts unsupported allegations. "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (citing *Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863

(6th Cir. 1986)). "If a moving party fulfills its burden of demonstrating that no genuine issue of material fact exists, the nonmoving party, to receive a trial, must present some significant probative evidence creating a factual dispute." *Stratienko v. Cordis Corp.*, 429 F.3d 592, 597 (6th Cir. 2005).

## ANALYSIS

### I. Waiver

Defendant first argues that Moore waived the right to bring any claims of racial discrimination or retaliation that occurred before signing the LCA. The LCA contains a release, which states that "[i]n consideration of [the LCA], Mr. Moore releases and forever discharges [Defendant] and the Union . . . from any and all liability of any kind whatsoever, relating to his employment with [Defendant], arising prior to the date of [the LCA.]" (LCA, Doc. 70-10, Pg. ID 1965.) Moore argues that the release was not knowingly and voluntarily given and is therefore invalid. "Federal common law controls the validity of a release of a federal cause of action." *Nicklin v. Henderson*, 352 F.3d 1077, 1080 (6th Cir. 2003). The Court must balance these factors to determine whether the release was entered into knowingly and voluntarily: (1) Moore's experience, background, and education; (2) how long Moore had to consider the release, including whether he had the opportunity to consult a lawyer; (3) the clarity of the release; (4) the consideration for the release; and (5) the totality of the circumstances. *See id.*

First, Moore has no formal legal education, training or experience. That said, Moore possesses an associate's degree in fashion merchandising and design and a bachelor's degree in health care administration. (Moore Dep., Doc. 70, Pg. ID 1589.) Sixth

7

Circuit precedent does not require a plaintiff to have any legal education or experience to find that a release was entered into voluntarily. *See Hank v. Great Lakes Constr. Co.*, 790 F. App'x. 690, 699 (6th Cir. 2019) (upholding a release even though the plaintiff "had only the equivalent of a high school diploma and no business or legal experience[.]"). Thus, the first factor supports finding that Moore knowingly and voluntarily entered into the release.

Second, Moore signed the LCA the same day it was provided to him. (Moore Dep., Doc. 70, Pg. ID 1669-71.) Prior to signing, Moore was told that he should read over the LCA. (*Id.* at 1670-71.) Nothing in the record suggests that Moore had to sign the LCA that day, nor does the record suggest that Moore asked for additional time to consider the agreement. Also, while Moore did not consult a lawyer, nothing in the record suggests that he could not have done so. And the Sixth Circuit has held that "[f]actor two weighs in favor of finding a knowing and voluntary waiver if the plaintiff simply does not request more time to either review the waiver or consult an attorney." *Hank*, 790 F. App'x. at 700.

Additionally, Frank Arrington, the Union Vice President, and Boland discussed and negotiated the LCA on Moore's behalf. (Boland Dep., Doc. 69, Pg. ID 1316-17.) Arrington was in the room when Moore signed the agreement, and Moore had the ability to consult Arrington before signing. (Moore Dep., Doc. 1670-71.) Thus, the second factor also supports finding that Moore knowingly and voluntarily entered into the release.

Third, the release is clear and unambiguous. It states, "[i]n consideration of [the LCA], Mr. Moore releases and forever discharges [Defendant] and the Union . . . from

8

any and all liability of any kind whatsoever, relating to his employment with [Defendant], arising prior to the date of [the LCA.]" (LCA, Doc. 70-10, Pg. ID 1965.) Such language includes claims of racial discrimination or retaliation. Also, by signing the LCA, Moore acknowledged that he read the LCA in full and understood its contents and consequences. (*Id.*) Fourth, the LCA was supported by adequate consideration. In consideration for the LCA, Moore was reinstated. So the remaining factors also support finding that Moore knowingly and voluntarily agreed to the release.

Considering the totality of the circumstances, Moore argues that the waiver contained in the LCA was not entered into knowingly or voluntarily because "[h]e only signed the agreement under duress because he was told that if he refused to sign it, he would be out of a job." (Response in Opp., Doc. 79, Pg. ID 2912.) Thus, Moore is arguing that he signed the LCA under economic duress and, as such, the release was not entered into knowingly or voluntarily.

"As a general matter, duress involves an unlawful or wrongful act or threat that overcomes the free will of the person." *Gascho v. Scheurer Hosp.*, 400 F. App'x. 978, 983 (6th Cir. 2010) (quotations omitted). Nothing in the record reflects that Defendant either committed an unlawful or wrongful act or threatened Moore to enter into the LCA. The fact that Moore would lose his job if he refused to sign the LCA does not rise to the level of economic duress. Moore's belief that he had no choice in signing the agreement, "in view of the economic benefits offered and the risk of economic hardship" if he refused to sign, "does not by itself state a claim . . . because this kind if threat is 'an accepted part of the bargaining process.'" *Gascho*, 400 F. App'x. at 983 (quoting Restatement (Second of

9

Contracts § 176 cmt. a). This is because "[a]ll bargaining . . . comes with implicit economic and psychological pressures[.]" *Id.* Thus, the economic considerations that pushed Moore into signing the LCA do not rise to the level of economic duress. Moore entered the LCA knowingly and voluntarily.

Because Moore entered into the LCA knowingly and voluntarily, he waived all claims of racial discrimination or retaliation regarding situations or circumstances that occurred before signing the LCA. The Court will only consider Moore's claims in relation to his employment with Defendant from July 14, 2017, when he signed the LCA, through his termination on July 31, 2018.

## II. Race Discrimination and Retaliation Under Title VII

Now the Court must address Moore's claims. Moore brings race discrimination and retaliation claims under Title VII and Ohio Rev. Code § 4112.02 and § 4112.99. "[F]ederal case law interpreting Title VII . . . is generally applicable to cases involving alleged violations" of Chapter 4112 of the Ohio Rev. Code. *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civ. Rts. Comm'n*, 421 N.E.2d 128, 132 (Ohio 1981). Thus, the same standard applies to both claims, allowing each claim to be addressed together.

When a plaintiff only offers indirect or circumstantial evidence of racial discrimination or retaliation, as Moore does here, the *McDonnell Douglas* burden shifting framework applies. *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 771-72, 776 (6th Cir. 2018). Therefore, under this framework, Moore has the initial burden to establish a prima facie case of discrimination and retaliation. *Id.* at 772. If Moore satisfies this burden, the burden shifts to Defendant to establish a legitimate, nondiscriminatory and non-

retaliatory reason for Moore's termination. *Id.* If Defendant satisfies its burden, then the burden shifts back to Moore who must show by a preponderance of the evidence that the reasons offered by Defendant are pretextual. *Id.*

### a. Prima Facie Case

The analysis for Moore's discrimination and retaliation claims diverge at his initial burden. To establish a prima facie case for racial discrimination, Moore must show that: "(1) he is a member of a protected class; (2) he was qualified for his job; (3) he suffered an adverse employment decision; and (4) he was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees." *White v. Baxter Healthcare Corp.*, 553 F.3d 381, 391 (6th Cir. 2008). "The prima facie elements of a retaliation claim are similar but distinct from those of a discrimination claim." *Michael v. Caterpillar Fin. Services Corp.*, 496 F.3d 584, 595 (6th Cir. 2007). To establish a prima facie case of retaliation, Moore must show that: (1) he engaged in activity protected by Title VII and Ohio law; (2) Defendant knew Moore exercised his protected right; (3) Defendant later took adverse employment action against Moore, or Moore experienced severe or pervasive retaliatory harassment; and (4) "there was a causal connection between the protected activity and the adverse employment action or harassment." *Id.*

Defendant first contends that Moore cannot establish the fourth element for a prima facie case for race discrimination: that he was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees. (Motion for Summary Judgment, Doc. 72-1, Pg. ID 2204.) Defendant also contends that Moore cannot prove the second or fourth element for retaliation: that Defendant knew

11

Moore exercised a protected right and that there was a causal connection between such protected activity and his termination. (Motion for Summary Judgment, Doc. 72-1, Pg. ID 2209.) Plaintiff, of course, disagrees with Defendants contentions. In any event, the Court, without deciding whether Moore satisfied his initial burdens, will assume that prima facie cases for both race discrimination and retaliation have been established.

### b. Legitimate, Non-Discriminatory and Non-Retaliatory Reason

Defendant must present a legitimate, nondiscriminatory and non-retaliatory reason for terminating Moore. *Blackshear v. Interstate Brands Corp.*, 495 F. App'x. 613, 618 (6th Cir. 2012). This standard is one of production, not persuasion. *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 585 (6th Cir. 2009). So, Defendant "must set forth, through the introduction of admissible evidence, the reasons for its decision." *Barrow v. Terminix Intern. Co.*, L.P. No. 3:07-cv-324, 2009 WL 243093, at *9 (S.D. Ohio Jan. 29, 2009). Defendant terminated Moore for insubordination, which as been held by the Sixth Circuit to constitute a legitimate reason for termination. *See Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325, 1330 (6th Cir. 1994); *see also Upshaw*, 576 F.3d at 589. Moore was terminated for testing positive for marijuana above the threshold limit on July 12, 2018 in violation of the SCA. (*See* 2018 Drug Test, Doc. 70-13, Pg. ID 1976-77; *see also* Corrective Action Form, Doc. 70-14, Pg. ID 1981.) Moore fails to challenge, and therefore concedes, that Defendant had legitimate, nondiscriminatory and non-retaliatory reason to terminate him. Thus, Defendant satisfied its burden.

### c. Pretext

Because Defendant established a legitimate, nondiscriminatory and non-retaliatory reason for terminating Moore, the burden shifts back to Moore to show that such reasons were pretext. *Alexander v. Ohio State Univ. Coll. of Social Work*, 429 F. App'x. 481, 487 (6th Cir. 2011). "Pretext may be demonstrated by showing by a preponderance of the evidence (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the action, or (3) that they were insufficient to motivate the action." *Id.* (cleaned up).

First, Defendant's proffered reason for terminating Moore in July 2018 is based in fact. Moore was terminated for failing a drug test on July 12, 2018 in violation of the SCA. (Corrective Action Form, Doc. 70-14, Pg. ID 1981.) Moore, in fact, tested positive for marijuana on July 12, 2018. (2018 Drug Test, Doc. 70-13, Pg. ID 1976-77.) This drug test was administered within the two-year period the SCA covered. (SCA, Doc. 70-11, Pg. ID 1996.) And Moore admitted that he failed the drug test. (Moore Dep., Doc. 70, Pg. ID 1698.) Thus, Defendant's proffered reason for terminating Moore was based in fact.

Second, nothing in the record suggests that Defendant's proffered reason did not actually motivate the action. The Sixth Circuit has held that "the reasonableness of an employer's decision may be considered to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was actual motivation." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003). Termination after a failed drug test is reasonable. The Drug and Alcohol Abuse Policy states that a failed drug test will result in termination. (Drug and Alcohol Abuse Policy,

13

Doc. 70-8, Pg. ID 1955.) Additionally, Moore knowingly signed the SCA, which subjected him to "any number of unannounced, unscheduled tests on [his] breath, blood, or urine for evidence of alcohol or drug use at times determined solely by [Defendant]" for the next two years. (*Id.* at 1966-67.) By signing the SCA, Moore also certified that he knew that he could be terminated for failing another drug test. (*Id.*) Thus, Defendant's decision to terminate Moore for a failed drug test was reasonable, and Moore cites no additional facts that would suggest that the failed drug test was not the actual reason for his termination.

Third, the failed drug test was sufficient to terminate Moore. Again, the Drug and Alcohol Abuse Policy states that an employee "who test positive for drugs, alcohol, or like substances during working hours or while on [Defendant's] property . . . shall be subject to immediate discharge." (Drug and Alcohol Abuse Policy, Doc. 70-8, Pg. ID 1995.) Moore signed the SCA on April 11, 2017, which allowed Defendant to randomly drug test Moore for two years. (SCA, Doc. 70-11, PG. ID 1966.) Moore was last drug tested on July 12, 2018, within the two-year period. (2018 Drug Test, Doc. 70-13, Pg. ID 1976.) Moore tested positive for more than 300 nanograms per milliliter of marijuana, which fell above the threshold outlined in the Drug and Alcohol Abuse Policy. (*Id.* at 1977.) Moore testified that he knew he tested positive for marijuana. (Moore Dep., Doc. 70, Pg. ID 1698.) Thus, the failed drug test was sufficient reason to terminate Moore.

The Court finds that Moore failed to establish that Defendant's proffered reason for his termination was pretextual. Defendant is entitled to summary judgment on Moore's federal and Ohio race discrimination and retaliation claims.

14

### III. Intentional Infliction of Emotional Distress

Lastly, Moore brought an intentional infliction of emotional distress ("IIED") claim. To establish such claim, Moore must show the following:

> (1) defendant intended to cause emotional distress, or knew or should have known its actions would result in plaintiff's serious emotional distress, (2) defendant's conduct was extreme and outrageous, (3) defendant's actions proximately caused plaintiff's emotional injury, and (4) plaintiff suffered serious emotional anguish.

*Rush v. E.I. DuPont DeNemours and Co.*, 911 F. Supp. 2d 545, 570 (S.D. Ohio 2012) (cleaned up). A plaintiff's emotional injury must be "so sever and debilitating that a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case." *Id.*

Moore fails to address Defendant's argument that his IIED claim should be dismissed. Thus, the Court accepts as true the facts stated in the affidavits and other papers submitted in support of Defendant's motion. *See* Fed. R. Civ. P. 56(e)(2), (3). Moore did not seek any medical attention from any mental health providers or counselors due of Defendant's actions. (Pl. Response to Def. Interrogatories, Doc. 70-16, Pg. ID 1996-97.) In fact, the record is bare of any evidence on Moore's alleged emotional injury. Thus, Moore failed to establish the fourth prong of his IIED claim. Defendant is entitled to summary judgment on Moore's IIED claim.

### CONCLUSION

Based on the above analysis, the Court **GRANTS** Defendant's Motion for Summary Judgment (Doc. 72). Plaintiff's Amended Complaint (Doc. 37) is **DISMISSED** with prejudice. This matter is **TERMINATED** from the Court's docket.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: _____

JUDGE MATTHEW W. McFARLAND

16